**William M. SALUS, Plaintiff–Appellee,**

v.

**GTE DIRECTORIES SERVICE CORP.,
Defendant–Appellant.**

**No. 96–1744.**

United States Court of Appeals,
Seventh Circuit.

Argued Nov. 7, 1996.

Decided Jan. 10, 1997.

---

Courtney Cox (argued), Hart & Hart, Benton, IL, for plaintiff–appellee.

Peter R. Bulmer (argued), Malory N. Harriman, Jackson, Lewis, Schnitzler & Krupman, Chicago, IL, Sandra G. Parker, GTE Directories Corp., Dallas, TX, for defendant–appellant.

Before FLAUM, DIANE P. WOOD, and EVANS, Circuit Judges.

FLAUM, Circuit Judge.

The district court, after a bench trial, entered judgment in favor of William M. Salus under section 510 of the Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. § 1001 *et seq.* The district court found that GTE terminated Salus in order to interfere with rights protected by ERISA. The district court also held that Salus was not required to pursue possible remedies under the GTE Short–Term Disability Plan ("STD Plan"), as pursuit of these administrative remedies would have been futile. GTE appeals the district court's decision on three grounds: (1) the district court's finding that GTE's articulated reason for firing Salus was pretextual was clearly erroneous; (2) the district court's finding that Salus was terminated with the specific intent to interfere with his short-term disability benefits was clearly erroneous; and (3) the district court abused its discretion by not requiring Salus to exhaust his remedies under the STD Plan. We conclude that the district court's factual findings underlying its determination that GTE was liable under section 510 are not clearly erroneous and that the district court's decision not to require exhaustion was a proper exercise of the court's discretion. We therefore affirm the judgment of the district court.

## I.

Salus sold advertising space in GTE's yellow pages from January of 1992, when he was hired as a Premise Sales Representative in GTE's Marion, Illinois sales office, until his employment was terminated in June of 1992. Salus' direct supervisor at GTE was Mel Fowler, the District Sales Manager responsible for the Marion office. The relationship between Salus and his supervisor, Fowler, was less than amicable. Salus testified that he was subject to almost daily threats of termination and general verbal abuse. By June of 1992, Salus' relationship with Fowler had deteriorated to the point that Salus began having nightmares about his job and was under such pressure at work that he felt as if he were "operating on pure guts and nerves." The relationship deteriorated because, according to Salus, Fowler was jealous of the commissions Salus was earning and because the two had a dispute regarding responsibility for a customer billing error that occurred in May of 1992.

As a result of this job-related stress, Salus began having painful headaches. These headaches became so unbearable that, on Monday June 15th, Salus had a friend call

Fowler to inform him that he would not be reporting for work. As a result of these headaches, Salus did not return to work for the rest of that week. Fowler fired Salus the following Monday. The events surrounding Salus' termination are in dispute. GTE alleges that Salus was fired because he failed to report to work or to call in for three consecutive days, whereas Salus maintains that Fowler was aware of his condition and that he was terminated in order to interfere with his right to short-term disability benefits.

It is undisputed that on Monday, the first day of Salus' absence, Fowler came to Salus' apartment to inquire as to his condition, and that Salus informed him that he had an appointment to see a doctor the next day and would therefore not be at work. The following day, Salus visited Dr. Oestmann, who diagnosed Salus as suffering from severe job-related stress. Dr. Oestmann instructed Salus not to return to work until he could see a psychiatrist and made Salus an appointment for the following Tuesday. Salus therefore requested that Dr. Oestmann call Fowler to advise him that he would not be at work until at least the following week.

Dr. Oestmann called GTE's Marion office the following day, Wednesday June 17th. The parties dispute whether Dr. Oestmann in fact spoke with Fowler. Dr. Oestmann testified that a male voice answered the phone and that he requested to speak with Fowler. After a pause, a male voice came on the line. Without waiting for the speaker to identify himself, Dr. Oestmann told the speaker that Salus was under his care and that Salus would not be returning to work until Salus could see a psychiatrist. The unidentified speaker responded, "Okay." Dr. Oestmann assumed that he had spoken with Fowler. Fowler, however, denies having this conversation. It is GTE's contention that the call must have been received by the "Message Center," the third-party, telephone answering service that covered GTE's phones. If no one was in the office, a Message Center employee would answer the phone with the greeting "GTE" or "GTE Yellow Pages" and would not indicate ·that the call was being answered by a message service. However,

the only male employee working that day testified that he did not recall taking a message from Dr. Oestmann. Fowler and Dr. Oestmann also spoke briefly later that same day as the result of a phone call initiated by Fowler. Both described this conversation as confused, as neither appeared to recognize the other's name at the time and neither identified his relationship to Salus. They both decided that there had been a mix-up and terminated the call. GTE contends that Fowler was returning Dr. Oestmann's call in response to the message he allegedly received from the Message Center.

As ordered by Dr. Oestmann, Salus did not return to work. On Monday June 22nd, Fowler and another GTE employee went to Salus' apartment in the evening and informed Salus that he was fired and asked him to return his office keys, company car, and any other property belonging to GTE. Fowler did not give Salus a reason for his termination. GTE maintains that Salus was terminated pursuant to its long-standing, unwritten "job-abandonment" policy. According to GTE, under this policy, an employee who does not report for work for three consecutive days without calling the office is considered to have abandoned his or her job and is fired.

The district court found that Dr. Oestmann had spoken to Fowler and that Fowler was therefore aware of Salus' need to remain off of work until at least the following week and that GTE's assertion of a job-abandonment policy as the basis for firing Salus was merely a pretext. The court also found that Fowler was aware that Salus' right to short-term disability benefits would end upon termination and that Fowler terminated Salus with the specific intent to interfere with his short-term disability benefits.

## II.

We first address GTE's claim that certain factual findings and conclusions made by the district court are clearly erroneous. Section 510 of ERISA provides, in pertinent part:

It shall be unlawful for any person to discharge, fine, suspend, expel, discipline, or discriminate against a participant or

beneficiary for the purpose of interfering with the attainment of any right to which such participant may become entitled under the plan....

29 U.S.C. § 1140. In order to recover under section 510, an employee must show that the employer terminated him with the specific intent to interfere with his ERISA rights. *See Teumer v. General Motors Corp.,* 34 F.3d 542, 550 (7th Cir.1994); *Meredith v. Navistar Int'l Transp. Co.,* 935 F.2d 124, 126 (7th Cir.1991). Plaintiff may satisfy this burden by either presenting direct evidence of interference with his protected benefits or by utilizing the burden-shifting analysis of *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). *See Grottkau v. Sky Climber, Inc.,* 79 F.3d 70, 73 (7th Cir.1996); *Little v. Cox's Supermarkets,* 71 F.3d 637, 642 (7th Cir.1995); *Clark v. Coats & Clark, Inc.,* 990 F.2d 1217, 1223 (11th Cir.1993); *Meredith,* 935 F.2d at 127. Salus relied upon the burden-shifting approach. In the section 510 context, this approach requires that a plaintiff establish a prima facie case of interference by demonstrating that he (1) belongs to the protected class; (2) was qualified for his job position; and (3) was discharged or denied employment under circumstances that provide some basis for believing that the prohibited intent to retaliate was present. *See Grottkau,* 79 F.3d at 73; *Little,* 71 F.3d at 642. Once the plaintiff establishes a prima facie case of interference, the burden shifts to the defendant to offer a legitimate, non-discriminatory reason for the challenged employment action. *See id.* If the defendant presents a legitimate reason, the burden then shifts back to the plaintiff to demonstrate that the proffered explanation is pretextual and that the "motivating factor behind the termination" was the specific intent to interfere with the plaintiff's ERISA rights. *See Meredith,* 935 F.2d at 127.

The district court found that Salus had established a prima facie case of interference with his short-term disability benefits. GTE does not challenge this determination. The court also found that GTE proffered a legitimate, nondiscriminatory reason for Salus' discharge, namely its job-abandonment policy. The court therefore shifted the burden to Salus to prove that the job-abandonment policy was a pretext and that he was terminated with the specific intent to interfere with his right to short-term disability benefits. GTE argues that the district court's findings that Salus satisfied his burden of proving GTE's proffered explanation for terminating him was pretextual and that he was terminated with the specific intent to interfere with his Plan benefits were clearly erroneous. We address each of these arguments in turn.

### A.

The district court based its determination that GTE's job-abandonment policy was a pretext on (1) its finding that Fowler was aware of Salus' condition and of his need to remain off work until after he saw a psychiatrist, and (2) its finding that GTE did not have a long-standing, unwritten job-abandonment policy. GTE contends that these two factual findings are erroneous. As this court has explained in previous section 510 cases, a district court's factual determinations must be more than arguably wrong—"we disturb a district court's § 510–related factual findings only if they are clearly erroneous." *See Meredith,* 935 F.2d at 127. "A factual determination is clearly erroneous only if, after considering all the evidence, the reviewing court is left with the definite and firm conviction that a mistake has been committed." *United States v. Messino,* 55 F.3d 1241, 1247 (7th Cir.1995) (citing *Anderson v. Bessemer City,* 470 U.S. 564, 573, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518 (1985)).

GTE argues that the district court improperly discounted Fowler's testimony that he did not speak with Dr. Oestmann and that the district court should have inferred from the confused phone between Dr. Oestmann and Fowler that Fowler was returning Dr. Oestmann's call. We agree that this is one permissible inference that could be drawn from the evidence presented to the district court, but "[w]here there are two permissible views of the evidence, the fact-finder's choice between them cannot be clearly erroneous." *Anderson,* 470 U.S. at 573, 105 S.Ct. at 1510; *United States v. Yusuff,* 96 F.3d 982, 989 (7th

Cir.1996); *Pignato v. American Trans Air, Inc.,* 14 F.3d 342, 347 (7th Cir.), *cert. denied,* 512 U.S. 1205, 114 S.Ct. 2675, 129 L.Ed.2d 810 (1994). The other permissible inference that could be drawn from this evidence is the one accepted by the district court—that Dr. Oestmann had in fact spoken to Fowler. The court found that the evidence that someone had transferred Dr. Oestmann's call to Fowler was more credible than Fowler's denial. The court also found it unlikely that, if a message had been taken, that the person taking the message would not have indicated that a message was taken or that someone would listen to Dr. Oestmann give Salus' entire diagnosis and then fail to give Fowler the message. The district court's view of the evidence is permissible given that the only male Message Center employee on duty had no recollection of taking Dr. Oestmann's message.

GTE next argues that the district court's finding that GTE did not have an established job-abandonment policy was clearly erroneous. According to GTE, the district court unreasonably rejected the testimony of the two GTE employees who testified to the existence of the policy. The district court found that the testimony of GTE's witnesses that the policy was well-established, or that it even existed, was severely undercut by the testimony of two former GTE employees, one of whom was a former Human Resources Administrator, that they had never heard of the policy. The district court permissibly chose to give more weight to the testimony of the two witnesses that were no longer employed by GTE. *See generally Williams v. Washington,* 59 F.3d 673, 682 (7th Cir.1995) ("In a credibility contest, the testimony of neutral, disinterested witnesses is exceedingly important."). This court will not reweigh the credibility of trial witnesses. *See Anderson,* 470 U.S. at 575–76, 105 S.Ct. at 1512 ("But when a trial judge's finding is based on his decision to credit the testimony of one of two witnesses ... that finding, if not internally inconsistent, can virtually never be clear error."); *Maher v. Harris Trust & Sav. Bank,* 75 F.3d 1182, 1189 (7th Cir. 1996); *Pignato,* 14 F.3d at 347. Further, the district court's decision to credit the testimony of the former employees was supported

by the absence of any mention of this alleged longstanding policy in GTE's personnel practices manual, which contains over 300 pages of detailed information. The district court therefore permissibly found that Fowler was both aware that Salus was remaining at home in accordance with his doctor's orders and that GTE had no longstanding, job-abandonment policy. The court's finding that GTE's assertion that Salus was fired pursuant to this policy was a mere pretext can therefore not be called clearly erroneous.

## B.

 GTE also argues that the district court's finding that Salus was terminated with the specific intent to interfere with his ERISA rights is clearly erroneous. In order to succeed on his claim, Salus bore the burden of establishing that his loss of short-term disability benefits was not a "mere consequence" of his dismissal, but was in fact "a motivating factor behind his termination." *See Meredith,* 935 F.2d at 127. A plaintiff need not present direct evidence of illegal intent to recover under section 510; circumstantial evidence is sufficient. *See Turner v. Schering–Plough Corp.,* 901 F.2d 335, 347 (3d Cir.1990). Circumstantial evidence of illegal intent includes evidence offered by the plaintiff that the proffered explanation for his termination was pretextual. *Troupe v. May Dep't Stores Co.,* 20 F.3d 734, 736 (7th Cir. 1994).

As mentioned above, the district court's finding that GTE's proffered explanation was pretextual is not clearly erroneous. This finding therefore also supports the district court's conclusion that Salus was fired with the specific intent to interfere with his Plan benefits. In addition, the court found that other circumstantial evidence supported a finding of illegal intent to interfere with Salus' right to short-term disability benefits. The court found (1) that Fowler was aware that Salus would not be returning to work until at least Tuesday June 23rd, and that Salus would become eligible for short-term disability benefits as of Monday June 22nd, (2) that Fowler was aware that Salus' right to these benefits would end upon termination of his employment, and (3) that the conflict-

ing dates on Salus' termination documents suggested an intent to interfere with Salus' right to disability benefits. GTE argues that these findings are clearly erroneous—in other words, "not plausible" in light of the evidence presented. *See Anderson,* 470 U.S. at 573–74, 105 S.Ct. at 1511–12.

GTE argues first that the district court erred in concluding that Fowler had knowledge of the details of the company's STD Plan because Fowler's job did not concern the administration of any of GTE's employee benefits plans and because Fowler testified that he had never read the employee manuals describing the available benefits. The district court, however, found Fowler's testimony that he was unaware that Salus' right to disability benefits expired upon termination not to be credible. This finding was supported by evidence that Fowler had copies of the relevant employee benefits manuals on the credenza in his office during the entire period of his employment at GTE. Further, Fowler's supervisory position and managerial training made it likely that Fowler had a familiarity with GTE's employee benefits plans. The only other evidence presented on the issue of Fowler's knowledge of the benefits plans was his own testimony that he was not familiar with personnel matters. The court was free to assess Fowler's credibility as a witness and to reject his testimony in light of the other evidence presented.[1] *See Anderson,* 470 U.S. at 575, 105 S.Ct. at 1512; *Mlsna v. Unitel Communications, Inc.,* 91 F.3d 876, 880 (7th Cir.1996).

GTE also disputes the reasonableness of the inference drawn by the district court from the conflicting dates on Salus' termination documents. Salus was fired on Monday June 22nd, his sixth day of absence. Fowler instructed that Salus' termination date and last day of work be entered on

various termination documents as Friday June 19th, Salus' fifth day of absence. These dates are relevant because Salus would not have become eligible for disability benefits until his sixth day of absence. The court found that Fowler made Salus' termination effective as of June 19th to ensure that Salus would not be entitled to any short-term disability benefits. GTE argues that this inference makes little sense: if, as the district court found, Fowler was familiar with the Plan, he would have known that terminating Salus would end Salus' entitlement to any benefits, regardless of Salus' termination date. Fowler would therefore have little reason to tamper with Salus' termination date.

We agree with GTE that the termination documents do not provide strong evidence of an intent to interfere with Salus' benefits, as it appears that the most at stake was the right to benefits coverage for one day. The district court, however, found that this inconsistency further supported the inference that Fowler was at least attempting to interfere with Salus' disability benefits by altering his termination date. It was permissible for the court to infer illegal intent on Fowler's part from this unexplained inconsistency.[2] As mentioned above, a district court's choice of one permissible view of the evidence over another does not amount to clear error. *See Yusuff,* 96 F.3d at 989. This evidence therefore provided some, although admittedly not much, circumstantial evidence in favor of the court's finding that Fowler had a specific intent to interfere with Salus' ERISA rights.

Lastly, GTE argues that the district court failed to take account of the abundant testimony in the record that indicated that Fowler's discharge of Salus was more likely motivated by other factors, such as the strong animosity between Salus and Fowler. Salus, however, was not required to prove that the

---

1. The Memorandum and Order of the district court contains several findings of fact by the trial judge that Fowler's testimony was not credible. For example, Fowler testified that he had spotted Salus' car at various locations during the period in which Salus claims to have been too ill to leave his home. The testimony of Fowler's wife, who was with him on the occasions he claims to have seen the car, contradicted Fowler's testimony. The court therefore found Fowler's alleged sightings of Salus' car not to be believable.

2. GTE argues that the date was recorded as June 19th, rather than June 22nd, because a flaw in GTE's computer software made it necessary to enter the same date for the "Last Day Worked" as the date entered for the "Termination Date." As the district court noted, this does not explain the discrepancy, as the date for both entries could just as easily have been June 22nd, the correct date of termination.

interference with his ERISA rights was the sole reason for his discharge. *Daughtrey v. Honeywell, Inc.*, 3 F.3d 1488, 1491 (11th Cir. 1993). Salus was required to prove only that Fowler's desire to interfere with his disability benefits *contributed to* Fowler's decision to terminate him. *See Teumer*, 34 F.3d at 550; *Meredith*, 935 F.2d at 127. Bearing in mind that it is not the role of this court to decide factual issues *de novo, Anderson*, 470 U.S. at 573, 105 S.Ct. at 1511, we conclude that the circumstantial evidence presented supported the district court's conclusion that Fowler's desire to interfere with Salus' rights to short-term disability benefits contributed to his decision to fire Salus.

### III.

We next address GTE's claim that the district court abused its discretion by not requiring Salus to exhaust his administrative remedies. The district court found that the pursuit of administrative remedies in Salus' case would have been futile and that exhaustion was therefore unnecessary. "[T]he decision to require exhaustion as a prerequisite to bringing suit is a matter within the discretion of the trial court. . . ." *Powell v. A.T. & T. Communications, Inc.*, 938 F.2d 823, 825 (7th Cir.1991). As we have made clear, this determination will only be disturbed on appeal if the lower court has clearly abused its discretion—in other words, if the lower court's decision "is obviously in error." *See Lindemann v. Mobil Oil Corp.*, 79 F.3d 647, 650 (7th Cir.1996); *Powell*, 938 F.2d at 825; *Dale v. Chicago Tribune Co.*, 797 F.2d 458, 466–67 (7th Cir.1986).

GTE argues that its STD Plan provided possible avenues of redress for Salus which the district court should have required him to pursue. The Plan states that an employee may appeal a benefits-related decision to the Plan Administrator. If that claim is denied, a beneficiary or his legal representative can then ask for a review of that decision by writing to GTE's Employee Benefits Committee. GTE does not dispute that Salus was clearly not entitled to any benefits under the STD Plan and that, had Salus filed a claim for STD benefits, his claim would have been denied. Nevertheless, GTE argues

that Salus should have filed a claim and then appealed that decision to the Employee Benefits Committee.

GTE contends that the STD Plan contains language which could have been interpreted by the Employee Benefits Committee as providing a remedy for Salus. The Plan states, under the heading "Your Rights Under ERISA," that "You may not be discharged . . . to prevent you from obtaining a benefit or exercising your ERISA rights." The Plan, however, does not provide a remedy should an employee attempt to bring a claim under this provision, nor has the Employee Benefits Committee ever addressed the issue of whether the STD Plan provides a remedy for an employee who claims to have been terminated in order to deny him his Plan benefits. GTE argues that the Employee Benefits Committee was denied an opportunity to decide this case of first impression.

Appellant points this court to prior decisions in which we have affirmed lower courts' decisions to require an exhaustion of administrative remedies. These decisions, however, merely affirm that it is within the discretion of the district courts to require exhaustion of administrative remedies. *See, e.g., Lindemann*, 79 F.3d at 650 (7th Cir. 1996); *Powell*, 938 F.2d at 825–26; *Dale*, 797 F.2d at 466–67. GTE ignores the reverse side of this coin—that it is also within the discretion of the district courts not to require exhaustion of administrative remedies. The decision not to require exhaustion, like the decision to require exhaustion, will be "disturbed only if the reviewing court is confident that the decision is obviously in error. Abuse of discretion means a serious error of judgment, such as reliance on a forbidden factor or the failure to consider an essential factor." *Powell*, 938 F.2d at 825.

The district court's opinion makes clear that the court was cognizant of the strong federal policy encouraging private resolution of ERISA-related disputes. The court nevertheless concluded that Salus' case was ripe for judicial review. Far from ignoring an essential factor, the trial judge examined GTE's Plan, including all possible avenues of redress available to Salus, with the policy behind the exhaustion doctrine in mind. We

are mindful that we are not asked to decide *de novo* whether Salus' pursuit of an administrative remedy would have been futile, but only to review the lower court's decision for abuse of discretion. Under the circumstances, we cannot say that the district court's decision, made after consideration of the policy interests at stake, was "obviously in error." *See Powell*, 938 F.2d at 825.

For the foregoing reasons, we conclude that the district court's finding of liability under section 510 was not clearly erroneous and that the court did not abuse its discretion in not requiring Salus to exhaust any possible Plan remedies. The judgment of the district court is therefore

AFFIRMED.